The Court can entertain jurisdiction of this cause, and afford relief agreeably to the English practice, as upon a bill quia timet.
1 Fonb. 38, 2 Eq. Cas. 254, pl. 1, 2; 1 Ves. 179; 1 P. Wms. 751, place the subject beyond the possibility of a doubt.
It was objected to the relief prayed in the last case that the plaintiff had acted inequitably; more so than can reasonably be supposed in this.
But if it were doubtful as to the point of jurisdiction, a recurrence to 2 Pow. Cont. 218, 219, shows that the defendant, by submitting to answer, has waived any objection to the jurisdiction of the Court. The authorities on this point may appear to vary, which no doubt was the reason of the 16th section of the act entitled "An act to regulate the proceedings of the Court of Equity, and for amendment of the law," passed in the year 1801, c. 6. This section admits of no doubt, and puts this part of the case at rest. It is too late now to except to the jurisdiction of the Court. The section is in these words; "after answer filed, and no plea in abatement to the local jurisdiction of the Court, no exception for want of such jurisdiction shall ever afterwards be made."
The bill states that Fulton has been frequently required to indemnify the complainants against the debts due by Davis and Fulton, but that he has evaded it. The complainants do not pray that the *Page 126 
money be paid to them, but that Fulton's debtors here may be enjoined from paying to him; and that the Court will appoint a receiver to take care of it until the plaintiffs are secured.
This case may, with propriety, be considered as a matter between the complainants and the creditors of Fulton. If they think that injustice would be done by arresting these debts and placing them in the hands of an officer of the court, they can come here and dispute about the fund.
The answer is only sworn to by Alexander Fulton, and not by James. The answer of one copartner cannot be received for both, unless it be shown that he is the only acting partner. James Fulton is not before the Court, for it would be absurd to say that the answer of one partner shall bind the other. The bill must be taken as true against James Fulton, as he has failed to answer.
Much reliance is placed on the assignment by Alexander and James Fulton to their creditors; that the debts now due have been transferred to their creditors, and consequently that they have not now any property in their hands. Let us examine this question. The deed of trust says that the property shall be divided among such of the creditors as shall think proper to accede to the terms of the assignment within eight months from the date. This instrument of writing does not appear to be signed by any person except Luke Tiernan and Alexander M'Donald, the trustees, and not by creditors. It is not binding on any, but those who have signed it, but suppose a few creditors had signed it, would it have been binding on others?
Here it appears that two persons are appointed trustees; friends no doubt; or suppose one or two creditors sign; will they be permitted to cover the property and exclude all others? They thought not. It has not appeared that the State of Maryland, where this contract was made, has any law recognizing such a proceeding as this.
The principles of the bankrupt law in England contemplate an assignment, with an equal distribution among creditors. The State of Maryland has no such law, nor have we. For all that appears to *Page 127 
the contrary, then, this case stands upon the principles of the common law, which is repulsive of the idea of a general assignment of the man's property. The maxim of the common law favors the vigilant, and not those who sleep. The first applicant is to be regarded. Suppose a creditor of the Fultons had attached these debts on the law side of the court; could the trustees in this assignment interplead so as to bar a recovery? Most clearly not.
The defendant states that he was imposed upon; but, how could this he the case? The books were as accessible to him as to his partner; he might have informed himself, and we must presume he did.
Upon final settlement of merchants' accounts, a balance sheet is usually made out. The answer does not specifically state the persons to whom the $17,000 were paid, and of which the defendant states that he did not receive any account from Davis. The answer ought to have stated this, so as to enable complainants to disprove this assertion. Fraud certainly goes to invalidate contracts, but courts are incompetent to the power of setting aside a contract in part. Where there is a part-performance, as in this case, the contract cannot be rescinded. The Court cannot place the parties in statu quo,
and therefore will not interfere;[1] but all presumption of fraud is resisted when we consider the time which has elapsed since the contract of dissolution was made. It has been made seven years; during this time we hear no complaint. The defendant states that he received $24,000 in goods, besides the debts of the old firm; and, forsooth, we are told that all this is to be applied to the payment of the debts of the new firm; and thus the representatives of Davis are to be left to pay the debts of the old after his having conveyed all the debts and stock in trade with which he could have discharged them.
If any distinction can be made, or any preference given as to debts, those of the old firm surely ought to obtain it: because they are first in point of time; because the old house furnished the fund which enabled the two Fultons to carry on trade; and, lastly, because the present complainants are the first applicants for redress. This last, however, *Page 128 
they considered the principal ground. How would the case have stood in Maryland, where the contract was made? If the complainants had applied to a court of equity for the purpose of being indemnified, would not the court there have given specific relief? They thought they would, and so ought the court here.
James Fulton does not pray to have the injunction dissolved. Taking the bill as true with respect to him, it seems clearly that the injunction ought to be held up against him as well as Alexander Fulton. They said that, before closing their observations upon the merits of the case, they would again renew the motion to read affidavits for the purpose of continuing the injunction; that, finding one of the Court had suggested there was a later authority upon this subject, they had examined the books further, and found one in Ves. Jr. 427, which they conceived came fully up to the present case. The injunction here is the only effective part of the bill. The defendant says he is insolvent, and if the injunction is not continued as to the debtors, the complainants will be without remedy. They will have to pay the $14,000, which the answer states to be owing, without a possibility of redress upon Fulton's covenant to indemnify.
WHITESIDE, in reply, said he would be able to show that the Court have not jurisdiction of this question, and if it should appear that they cannot decree upon final hearing for want of jurisdiction, it would be nugatory to continue the injunction. The Statute of 1787, c. 22, § 1, discovers the sense of our government on this question; it is in these words: "Provided, always, that this act shall not extend, nor be construed to extend, to warrant or make good any proceeding against any person residing without the State,, unless the ground or cause of action, or the transaction on which the bill may be brought, took place within the limits of the State." There is no dispute respecting the place where the cause of action arose in this case; it is agreed on all hands to have arisen in the State of Maryland, and that all the parties, both plaintiffs and *Page 129 
defendants, except the debtors, are citizens of the State of Maryland. In the consideration of this part of the case, the debtors ought to be put out of the question; the original transaction does not involve them; the place where the cause of action arose, and the parties being citizens of another State at the time of the contract, are the only points for the consideration of the Court. The section referred to is decisive, and shows that the Court cannot take cognizance of the case. The Act of 1801, alluded to by the plaintiff's counsel, proceeds on the same grounds. The second section of the act enacts that where debts shall have been contracted in other States, and it shall appear to the said Court, or a judge thereof, by affidavit annexed to the bill, or otherwise, that any such debtor has not sufficient property liable to execution byfieri facias in the State where he resides, to satisfy such debt, and the said debtor shall own real or personal property in this State, then and in that case such court shall have power and authority, upon a bill being exhibited for that purpose, to make real or personal property as aforesaid liable for such debt; provided, the complainant shall in all cases exhibit sufficient proof of his having taken all legal measures for the recovery of his debt; which proof shall consist of a complete transcript of the judgment and execution obtained against such debtor; and such transcript shall be certified under hand and seal of the clerk of the court in which such judgment was obtained.
The act has prescribed the proof requisite. It is not pretended that Alexander Fulton has been pursued to judgment or execution upon the covenant in the State of Maryland. Have the complainants shown, by return of an execution, that no property can be had in Maryland so as to authorize recourse in our courts upon a contract made in another government, and between citizens of that government? They have not, and consequently must fail ultimately.
The bill does not show that the complainants have paid any of the debts which were the subject of the covenant; that the defendant has been required to pay them, nor does it show that the defendant is *Page 130 
likely to become insolvent, which is an essential part of the bill; for there ought to be an express charge to this effect, so as to bring it within the Act of 1801; nay, it ought to go further, and expressly charge insolvency, so as to authorize the Court to act on a foreign contract.
The bill barely states that the complainants are apprehensive, they shall be obliged to pay the debts due from Davis and Fulton in case of the insolvency of Fulton. Here is no express charge of insolvency, nor even a probability of it.
The answer of Alexander Fulton is as complete as if James Fulton had answered. Alexander swears that James was privy to all the transactions, which is all that is necessary, as to the point now before the Court, that is, whether the injunction shall be dissolved or not; at all events affidavits cannot be read according to the practice which has hitherto prevailed in our courts; but if they could in some cases they cannot in this: there being no specific charge of insolvency in the bill which would serve as a ground for reading them. But if the Court were inclined to afford relief they surely would not do it, unless the contract were fair in all its circumstances, and clear of any imputation of fraud or injustice. The defendant swears to misrepresentation and imposition on the part of Davis; and he took it to be too clear to admit of argument, that, in order to entitle a person to a specific execution of an agreement in this court, it should be fair and unattended with fraudulent circumstances. The case, as it appears upon the defendant's answer, is not such a one as ought to entitle the complainants to relief upon final hearing; under this impression it would be useless to continue the injunction. It would be unjust to arrest the debts due the new firm; there can be no pretence of a lien; the fleeting and transitory nature of stock and credit in trade will not bear the idea.
The defendant swears that it was not the stock of the old concern alone which enabled the new firm to carry on trade: it was the credit which they had in Europe principally; how unjust, then, would it be to stop the debts of this firm to answer *Page 131 
exclusively those of the old? When in all probability the debts contracted by Alexander and James Fulton were contracted upon their own credit, and not from the fund in their hands, derived from the old stock. Whatever decree the Court may deem it proper to make, they cannot affect the interest of James Fulton in these debts; it has been sufficiently shown that the stock and debts of the new firm cannot be pursued as a lien; then to decree against James Fulton would contravene the first principles of equity, he would be subjected, to a charge arising from a concern of others from which he could not possibly derive any benefit; therefore he ought not to be subject to any of its burdens; this would not be all, for it would leave James still liable to the debts of the new firm.
There is another strong ground of objection against the relief sought by the complainants: it appears clearly from the deed of assignment produced, that neither of the Fultons have any property in these debts; they have been legally assigned to their trustees, Tiernan and M'Donald. If this reasoning be just, it is impossible for the Court to make any decree to affect their interest, unless they were parties and before the Court.
To conclude this important question, the Court will indulge a few remarks, in answer to the observations which dropped from the other side, respecting the responsibility of James Fulton's interest in the affair.
It is said that he did not bring any stock into trade, and that he well knew the whole stock of the new house had arisen from the contract with Davis. Suppose he had, he also knew that Davis' covenant was not a lien; it was only a general personal security on Alexander Fulton, who had a complete property in the goods and debts of the old firm after Davis' assignment, that if his brother chose to admit him to a participation of his stock, he had as perfect a right to do so as with respect to property which had never been in trade with Davis and Fulton at all.
[1] See 1 Wil. ed. Bac. Ab. 109, n.
A question has been made with *Page 132 
respect to reading affidavits in opposition to the statements in the answer. It is urged that no instance has occurred in the practice of our courts where it has been done. Though this might create a presumption of what was considered law, it is not conclusive; perhaps the question may not have been judicially investigated; being now before the Court, we are constrained to turn our attention to it.
It has long been settled as law, that affidavits should be received when the violation of patent-rights respecting literary property came into view; and also in cases respecting waste. The reason appears obvious: these are cases where the injunction is the remedial part of the bill, from the very nature of the subject-matter in dispute. If injunctions were to be dissolved in these cases, books might be so multiplied by printing in the first, that the benefit of the patent might be destroyed; and, in the other, such excessive waste committed by falling of timber and otherwise as to leave the laud of but little value before a final hearing could be had. The general practice of the Court is well understood not to admit of affidavits; it is certainly correct as a general rule, but both reason and the books show that this rule admits of exceptions. Mr. Justice Buller, in the case of Isaacs v. Humpage, 1 Ves. Jr. 427, says that it is a good reason for refusing affidavits where the rights of the parties will remain at the hearing in statu quo, as when the bill was filed. This, I think, should be considered as the true ground of exception to the general rule; at present it seems doubtful whether the other ground offered by Justice Buller ought to prevail in this country; he observes, in that case, that the plaintiff proceeded wholly on the ground of fraud, which decides the propriety of reading the affidavits, and further says that there is no instance where the Court has refused to go into evidence, in that case. It will be recollected that this was an injunction obtained against a verdict at law. It has not been usual to read affidavits to hold up injunctions in this State, nor is a single instance recollected.
The courts have frequently required security to be given, to refund in case of a decree against the *Page 133 
defendant upon final hearing, before they would dissolve an injunction. This, however, has been considered discretionary; it is presumable that they have ordered it whenever there was reasonable ground to suppose the parties would not be in statu quo at the hearing; perhaps this were a better method than the practice of hearing affidavits read in cases of fraud, as stated by Buller; as there are few cases of bills with injunctions against verdicts, at law but what charge fraud. To admit affidavits, then, in the case of fraud in obtaining a verdict at law might open too wide a door to litigation. The point for the Court to consider in this case, is whether, supposing for a moment the Court has power to afford relief, the parties will remain in statuquo at the hearing.
It is admitted on all hands that the bond of indemnity was given; that there now due $14,000; and that the defendant. Alexander Fulton, is now insolvent, is admitted by his own answer. How, then, is it possible that the parties can be in statu quo at the hearing? They cannot. If these debts are recovered he will not have the means of indemnification. The injunction, therefore, though collateral to the main question, is the only efficient part of this bill. Upon this ground the affidavits ought to be read.
In discussing the points of jurisdiction and relief it will be necessary to consider, first, the case upon the ground of the English authorities; secondly, under the alteration introduced by our own government; and, thirdly, with a view to the shape in which the subject presents itself to the Court.
The power of the Court of Chancery to act in England, is inpersonam and not in rem. This contract was made in Maryland, between citizens of that State. Agreeably to the authorities, the Court of Chancery in England could not take cognizance of the principal case; that is, the indemnity sought for by the plaintiffs against the two Fultons. They are not citizens of the State, nor has any process been served on them; the incidental question respecting the debtors must depend entirely upon the main question of indemnity; but suppose the two *Page 134 
Fultons had resided in England, would the Court there have afforded relief upon the principal question of indemnity as against the two Fultons? It appears clearly that they would; the reason given in the case of Ranalah v. Hays is conclusive, that it would be against the principles of justice and propriety that a man should always have a cloud hanging over him. A person who has engaged to indemnify another should be decreed to do so after a considerable time has elapsed, from which cause of uneasiness might rationally arise. The case of Pollin v. Huban is decisive of this part of the case, if any doubt had existed before. How would the case stand with respect to the injunction against the debtors? It is probable the English courts would not in this way enjoin the debtors from paying the Fultons. But their bankrupt law would attain the same end as between merchants. In other cases it seems highly reasonable to believe that they would sustain an injunction against the debtors.
In taking a view of the second point in discussion, we are led to notice the proviso in the Statute of 1787, c. 22. This act was passed to make process in equity effectual against absconding and non-resident defendants; the exception referred to puts it out of the power of this court to entertain jurisdiction of a cause of action which arose out of the State; this was in affirmance of the common law; but is this provision not impaired by any subsequent act? The second section of the Act of 1801, c. 6 has materially changed this part of the law. In order to understand the meaning and extent of the section we will consider the inconvenience which was intended to be remedied. At and previous to the passage of this act non-residents owned much property in this State. It is probably the case in every State, in some degree.[1] The citizens of other States, having property here, might owe debts in their own neighborhood, and not have any property to pay them; this law was intended for the benefit of foreign or domestic creditors who could have no other way to get at the property of a debtor, who had never resided in this *Page 135 
State, and where the contract had been made abroad. It is certainly a liberal policy, and well calculated to promote harmony in confederate States. The act requires that proof shall be made to the Court of a defendant's incapacity to satisfy debts in the State where he may be resident; and prescribes the proof which the Court shall require, a certified copy of a judgment, and return of nothing found upon afieri facias, thereon. This section repeals the proviso to the Act of 1787, c. 22, in all cases where a foreign debtor has property in this State and none in the State where he may be resident. That act passed in the year 1787, this in the year 1801; the Act of 1801 confers a new power on our courts of equity to act in rem, where they could only act in such case in personam before. This idea may be further illustrated by adverting to the third section of the act; that the said court shall have power to issue attachments as at law, in order to carry into effect the above provisions (meaning those alluded to in the second section), "and in such other equitable cases where the Court may deem it right and proper to render process in equity more effectual, by superseding sequestration agreeably to the practice of chancery in England."
The principles of equity embrace the main question of indemnity, as appears from the cases cited. The Act of 1801 gives the means of affording relief in a case which, by general principles, would be proper, by authorizing this court to act in rem, in relation to foreign contracts, when the debtor shall be insolvent. We are now brought to the consideration of the third position. The general scope and object of the bill is to be indemnified. When viewing this part of the case, nothing more will be requisite than to consider the objections to relief. It is contended that the imputation of fraud and imposition made by the answer will bar any relief; that a contract must be fair and unexceptionable in all its parts, or this court will not specifically relieve.
It is certainly true that there is an imputation of that kind in the answer, but, when we consider the whole circumstances of the case, it seems difficult to conceive how such imposition could take place. The *Page 136 
affidavit of Moses Rawlings states that he was employed as a clerk in the house of Davis and Fulton, from the year 1796 to the month of October, 1798; that Alexander Fulton came from Europe some time in the spring 1798; that Davis was absent several months from the house, being at the Sweet Springs, in Virginia, and returned in September, 1798; that, during the whole time of Davis' absence, Fulton transacted the business of the house; that a balance sheet was made out, which, as well as the books of the concern, he believes to have been correct.
If the books were accessible to Fulton, it is difficult to conceive such a case of imposition as would entitle Fulton to relief, from the contract of dissolution; but Rawlings' affidavit shows that Fulton must have been acquainted with the state of the concern, unless he shut his eyes. Rawlings says that the books were correct, and the balance sheet made from it. Besides, is it likely that Davis had defrauded Fulton, when we find the articles which are complained of expressly provide that the contract of dissolution was to be void in case Davis survived his then indisposition. Would a man in the very act of making a contract, from an expectation of death in a short time, defraud his partner by wilful misrepresentations, and provide for a continuance of the concern in case he survived? Such things are not the ordinary course of human affairs.
Let it however be observed that this is not upon a final hearing, when an issue of fact could be referred to a jury at the instance of either party. This is a motion for a dissolution of the injunction, when we must take the case under the impression it has made without the aid of a verdict. From the whole complexion of this case, I cannot presume there was fraud; but it is not now necessary to go further into this part of the case than to show that it does not appear under such circumstances as to induce a dissolution. Whether actual fraud or not, may be reserved until the final hearing of the cause.
The position taken by the defendant's counsel, that there was no lien on the stock of the old firm after the assignment of Davis, is certainly *Page 137 
correct. It was only a general security binding upon Alexander Fulton.
It is objected that there is no specific charge of insolvency contained in the bill so as to bring the case within the Act of 1801; and if there was, that the proof of insolvency is defective: there should have been a transcript of the records, showing that nothing could be got in Maryland.
There does appear some solidity in the first part of this objection. This question, however, does not now come before us upon final hearing; if it did, I should be strongly inclined to think that the charge of insolvency in the bill is not sufficiently strong and specific to bring the case within the Act of 1801. This act is bottomed upon the principles of the common law as to the redress to be afforded the first applicant, and not upon the more equitable principles of the bankrupt law of England in this respect. We have not been able to learn that the State of Maryland has any bankrupt system; we cannot take notice of any of the creditors of Fulton, except such as are before the Court. For the plaintiffs to bring their case within the Act of 1801, it seems necessary that the defendant's insolvency, where the contract was made, should appear.
The plaintiffs have stated an apprehension of their insolvency in the bill; but had they not done this, the bill, without the least idea of insolvency, would furnish an equitable case upon general principles. Seeing that the defendant has submitted to answer which puts it out of his power to except to the local jurisdiction of the Court, by the sixteenth section of the Act of 1801, as to the main question of indemnity; and that he has in his answer confessed his insolvency, I am of opinion that the injunction ought not to be dissolved upon the ground of the want of a specific charge of insolvency in the bill. What effect an objection of this kind might have upon final hearing it is not now necessary to determine.
But it is urged that the proof of insolvency required by the act is not produced, nor can it be, no suit in the State of Maryland having been instituted. The answer to this objection may be found in *Page 138 
all the books which speak of the construction of statute's. The equitable meaning of the legislature is the object. Did they mean to exclude all other methods of proof than the one they have pointed out? No, it would be absurd to suppose it; the substantial part of the section is to give this court jurisdiction in certain cases. The legislature have said, in order to ascertain these cases, a particular kind of proof shall be adduced; but can it be supposed that they meant to exclude other proof of as high, or a higher nature? Surely not. The defendant confesses that he is insolvent. What higher proof could a court of justice look for? None. This part of the case appears sufficiently clear of doubt, at least upon a motion to dissolve after answer.
The last consideration for the Court respects the deed of assignment from the two Fultons to their trustees, for the benefit of their creditors. It is argued that this vests their property, as well in action as in possession, in the trustees.[1]
No law of the State of Maryland is produced to us to prove that the property in the State of Maryland would vest as contended for. We cannot presume there is such a one; and must take up the subject as it stands at common law. This assignment certainly cannot be obligatory on any but those who might think proper to sign it: those who have not acceded to the terms of it, surely are not bound if others are. No debtor has a right to withdraw his property from the ordinary operation of law, as it respects his creditors.[2]
However rational a proportional division of property may be in case of a deficiency as to the payment of all, it cannot be noticed, unless under a bankrupt system, or one respecting insolvency modified upon the same principles. None such has appeared to us, therefore the assignments so far from appearing proper, would wear a contrary aspect. It does not appear that the complainants or any person for them signed this paper; they are, therefore, out of the question.
The interest of James Fulton in these debts cannot *Page 139 
be affected. The contract of indemnity could not operate as a lien; and upon that ground only could his interest in those debts be enjoined.
Let the injunction be dissolved as to James Fulton's interest in the debts, being one-half, and continued as to Alexander Fulton's interest in them, or the other half, until final hearing. But if Alexander Fulton shall give to the clerk and master of this court such good and sufficient security to abide by, and perform the final decree of the Court, as he shall approve, to the amount of $14,000; then the injunction as to him shall also stand dissolved.
[1] Vide 2 Dall. 417, 418; Swift's System.
[1] See 2 Binney, 174.
[2] Vide 2 Term Rep. 24; Heathcote et als. v.
Crookshanks.